ANNEX 1
Comparison of Colorado Complaint and New York Complaint

| Colorado Complaint | | New York Complaint | |
|---|---|---|---|
| Paragraph | Allegation | Paragraph | Allegation |
| 20 | In 2009, Sequoia began experiencing cash flow challenges, including difficulties in meeting payroll. This led Sequoia management to investigate potential purchasers or investors in Sequoia. | 15 | In 2009, Sequoia began experiencing cash flow challenges, including difficulties in meeting payroll. This led Sequoia management to investigate potential purchasers or investors in Sequoia. |
| 21 | Sequoia and the State of New York Executive Department, Office of General Services are parties to Comptroller's Contract No. PC63813 for Voting Systems and Related Services and Ballot Marking or Other Voting Devices Accessible to Individuals with Disabilities (as amended from time to time, the "NY Contract"). Pursuant to the NY Contract, for the period from January 23, 2008 through January 31, 2013, counties in New York could purchase electronic voting machines and other related goods and services from Sequoia through a requisition process under the terms and conditions set forth in the NY Contract. | 16 | Sequoia and the State of New York Executive Department, Office of General Services were parties to Comptroller's Contract No. PC63813 for Voting Systems and Related Services and Ballot Marking or Other Voting Devices Accessible to Individuals with Disabilities (as amended from time to time, the "NY Contract"). Pursuant to the NY Contract, for the period from January 23, 2008 through January 31, 2013, counties in New York could purchase electronic voting machines and other related goods and services from Sequoia through a requisition process under the terms and conditions set forth in the NY Contract. |
| 22 | In April 2009, Sequoia approached Dominion Canada about a possible transaction involving the NY Contract. Sequoia and Dominion Canada entered into an Asset Purchase Agreement, dated July 15, 2009 (the "2009 APA"), pursuant to which Dominion Canada acquired the NY Contract and Sequoia's rights under a related lease. In exchange, Dominion Canada agreed to pay Sequoia | 17 | In April 2009, Sequoia approached Dominion Canada about a possible transaction involving the NY Contract. Sequoia and Dominion Canada entered into an Asset Purchase Agreement, dated July 15,2009 (the "2009 APA"), pursuant to which Dominion Canada acquired the NY Contract and Sequoia's rights under a related lease. In exchange, Dominion Canada agreed to pay Sequoia |

| | | | |
|---|---|---|---|
| | an aggregate of $2.366 million in cash and a percentage of any Qualified NYS Order or NYC Order (each as defined in the 2009 APA) in 2009 or 2010. | | an aggregate of $2.366 million in cash and a percentage of any Qualified NYS Order or NYC Order (each as defined in the 2009 APA) in 2009 or 2010 (the "2009 Transfer"). |
| 23 | On information and belief, based on discovery under Fed. R. Bankr. P. 2004, Dominion Canada paid Sequoia the $2.366 million in cash consideration under the 2009 APA, but there were no Qualified NYS Order or NYC Order so no additional consideration was paid to Sequoia. | 20 | On information and belief, Dominion Canada paid Sequoia the $2.366 million in cash consideration under the 2009 APA, but there were no Qualified NYS Orders or NYC Orders so no additional consideration was paid to Sequoia. |
| 24 | On information and belief, based on discovery under Fed. R. Bankr. P. 2004, the NY Contract and the individual contracts with New York counties entered into under this master agreement constituted some of Sequoia's most valuable and most profitable assets. | 21 | On information and belief, the NY Contract and the individual contracts with New York counties entered into under the NY Contract constituted some of Sequoia's most valuable and most profitable assets. |
| 25 | Sequoia neither marketed the NY Contract to any party other than Dominion Canada nor shopped the offer from Dominion Canada to any other party. On information and belief, based on discovery under Fed. R. Bankr. P. 2004, the assets sold under the 2009 APA were worth more than the consideration paid by Dominion Canada. | 22 | Sequoia neither marketed the NY Contract to any party other than Dominion Canada nor shopped the offer from Dominion Canada to any other party. On information and belief, the assets sold under the 2009 APA were worth more than the consideration paid by Dominion Canada. |
| 26 | The 2009 APA did not resolve Sequoia's cash flow difficulties, and within months after the closing of the 2009 APA, Sequoia began investigating the possibility of locating a potential purchaser. | 24 | The 2009 APA did not resolve Sequoia's cash flow difficulties, and within months after the closing of the 2009 APA, Sequoia began investigating the possibility of locating a potential purchaser. |
| 27 | In January 2010, Sequoia and Dominion opened discussions on | 25 | In January 2010, Sequoia and Dominion opened discussions on |

| | | | |
|---|---|---|---|
| | a larger transaction between the two, and in February 2010, Sequoia and Dominion exchanged term sheets describing a potential transaction. | | a larger transaction between the two, and in February 2010, Sequoia and Dominion exchanged term sheets describing a potential transaction. |
| 28 | In term sheets circulated on or about February 11, 16, and 18, 2010, the parties discussed a purchase by Dominion of 90-98% of the equity interests in Sequoia (presumably from the Debtor) for a price to be determined. In connection with this deal, Dominion would enter into a one-year employment contract with Jack Blaine, Sequoia's chief executive officer, at an annual salary of $120,000 plus $30,000 in other benefits. | 26 | In term sheets circulated on or about February 11, 16, and 18, 2010, the parties discussed a purchase by Dominion of 90-98% of the equity interests in Sequoia for a price to be determined. In connection with this deal, Dominion would enter into a one-year employment contract with Jack Blaine, Sequoia's chief executive officer, at an annual salary of $120,000 plus $30,000 in other benefits. |
| 29 | In a March 5, 2010 letter of intent, Dominion US proposed to purchase substantially all of the assets of Sequoia (excluding accounts receivable, cash balances, and tax assets) for an aggregate purchase price of $9.5 million, consisting of $5 million in cash plus up to $4.5 million in contingent payments. | 27 | In a March 5, 2010 letter of intent, Dominion US proposed to purchase substantially all of the assets of Sequoia (excluding accounts receivable, cash balances, and tax assets) for an aggregate purchase price of $9.5 million, consisting of $5 million in cash plus up to $4.5 million in contingent payments. |
| 30 | On June 4, 2010, Sequoia and Dominion US entered into an Asset Purchase Agreement (the "2010 APA"). Under the 2010 APA, Dominion US purchased from Sequoia substantially all of the assets of Sequoia (again, excluding accounts receivable, cash balances, and tax assets) for an aggregate of $7.5 million, consisting of approximately $3 million in cash plus up to an aggregate of $4.5 million in contingent payments. | 28 | On June 4, 2010, Sequoia and Dominion US entered into an Asset Purchase Agreement (the "2010 APA"). Under the 2010 APA, Dominion US purchased from Sequoia substantially all of the assets of Sequoia (again, excluding accounts receivable, cash balances, and tax assets) for an aggregate of $7.5 million, consisting of approximately $3 million in cash plus up to an aggregate of $4.5 million in contingent payments (the "2010 Transfer"). |

| | | | |
|---|---|---|---|
| 31 | At approximately the same time, Dominion Canada and Blaine entered into an employment agreement on substantially better terms than provided in the March 5, 2010 letter of intent. The Employment Agreement was for three years and provided Blaine with an annual salary of $350,000, annual living expenses of more than $50,000, a percentage of Dominion's revenue from non-US business generated by Blaine, together with a one-year salary and benefits severance package if he were terminated before the end of the three year term of the agreement. | 29 | At approximately the same time, Dominion Canada and Blaine entered into an employment agreement on substantially better terms than provided in the March 5, 2010 letter of intent. The Employment Agreement was for three years and provided Blaine with an annual salary of $350,000, annual living expenses of more than $50,000, a percentage of Dominion's revenue from non-US business generated by Blaine, together with a one-year salary and benefits severance package if he were terminated before the end of the three year term of the agreement. |
| 32 | During the time of the negotiations with Dominion, Sequoia received an offer from a prominent company in the elections machine industry to purchase its assets. Though Sequoia did not pursue this offer, the Plaintiff believes that if Sequoia had pursued such offer, the competition for Sequoia's assets would have provided a safeguard against a fire sale of Sequoia's assets and would have resulted in a higher purchase price, including a higher guaranteed cash component of the purchase price. On information and belief, some Sequoia management preferred this third-party offer to a sale of Sequoia's assets to Dominion. | 30 | During the time of the negotiations with Dominion. Sequoia received at least one offer from a prominent company in the elections industry to purchase Sequoia's assets and made an offer to another prominent company. Though Sequoia did not pursue these offers, Plaintiffs believe that if Sequoia had pursued such offers, the competition for Sequoia's assets would have provided a safeguard against a fire sale of Sequoia's assets and would have resulted in a higher purchase price, including a higher guaranteed cash component of the purchase price. On information and belief, some Sequoia management preferred one of these third-party offers to a sale of Sequoia's assets to Dominion. |
| 33 | Upon information and belief, based on discovery under Fed. R. Bankr. P. 2004, Sequoia has | 31 | Upon information and belief, Sequoia has received the cash consideration from Dominion |

4

| | | | |
|---|---|---|---|
| | received the cash consideration from Dominion US under the 2010 APA but none of the contingent payments. It is not expected that the contingent payments will be paid under the terms of the 2010 APA. | | US under the 2010 APA but none of the contingent payments. It is not expected that the contingent payments will be paid under the terms of the 2010 APA. |
| 34 | Setting aside the $4.5 million contingent payments proposed by Dominion (which Plaintiff understands were unlikely to ever be paid), Sequoia sold substantially all of its assets to Dominion US for $3 million, i.e., $2 million less than the amount originally proposed by Dominion US and, upon information and belief, substantially less than a competing offer received from a third party. In contrast, the employment agreement with Blaine, who was one of Sequoia's principal negotiators on the 2010 APA, improved substantially: salary from $120,000 to $350,000; annual benefits of $30,000 to more than $50,000; a one-year employment term to a three-year employment term; and the introduction of a one-year severance package. | 32 | Setting aside the $4.5 million contingent payments proposed by Dominion (which Plaintiffs understand were unlikely to ever be paid), Sequoia sold substantially all of its assets to Dominion US for $3 million, i.e., $2 million less than the amount originally proposed by Dominion US and, upon information and belief, substantially less than a competing offer received from a third party. In contrast, the employment agreement with Blaine, who was one of Sequoia's principal negotiators on the 2010 APA, improved substantially: salary from $120,000 to $350,000; annual benefits of $30,000 to more than $50.000; a one-year employment term to a three-year employment term; and the introduction of a one-year severance package. |
| 46 | The Debtor received less than a reasonably equivalent value in exchange for the 2009 Transfer. | 35 | Sequoia received less than a reasonably equivalent value and less than fair consideration in exchange for the 2009 Transfer. |
| 47 | The 2009 Transfer was made (a) at a time when the Debtor was engaged or was about to engage in a business and transactions for which the remaining assets of the Debtor were unreasonably small in relation to the business and transactions, (b) at a time when the Debtor intended to incur, or believed or should | 36 | The 2009 Transfer was made (a) at a time when Sequoia was engaged or was about to engage in business activities and transactions for which the remaining assets of Sequoia were unreasonably small in relation to the business and transactions, (b) at a time when Sequoia intended to incur, or |

| | | | |
|---|---|---|---|
| | reasonably have believed that it would incur, debts beyond its ability to pay as they became due, (c) at a time when the Debtor was insolvent or (d) with the result that the Debtor became insolvent as a result of the 2009 Transfer. | | believed or should reasonably have believed that it would incur, debts beyond its ability to pay as they became due, (c) at a time when Sequoia was insolvent and/or (d) with the result that Sequoia became insolvent as a result of the 2009 Transfer. |
| 48 | At all times relevant to this Complaint, there were actual creditors of the Debtor with allowable unsecured claims who could avoid the 2009 Transfer under applicable state law. | 37 | At the time of the 2009 Transfer, Smartmatic International and Smartmatic Services were creditors of Sequoia. |
| 49 | Dominion Canada did not give value to the Debtor in exchange for the 2009 Transfer and did not enter into the 2009 Transfer in good faith. | 38 | Dominion Canada did not give reasonably equivalent value or fair consideration to Sequoia in exchange for the 2009 Transfer and did not enter into the 2009 Transfer in good faith. |
| 50 | Accordingly, the 2009 Transfer should be avoided and set aside as fraudulent under 11 U.S.C. § 544(b)(1) and applicable law, including but not limited to C.R.S. §§ 38-8-105 and 106 and/or Delaware Code tit. 6, §§ 1304 and 1305. | 39 | Accordingly, the 2009 Transfer should be avoided and set aside as fraudulent under applicable law, including but not limited to N.Y. Debt. & Cred. Law §§ 273, 274 and 275: C.R.S. §§ 38-8-105 and 106; and/or Delaware Code tit. 6, §§ 1304 and 1305. |
| 73 | The Debtor received less than a reasonably equivalent value in exchange for the 2010 Transfer. | 41 | Sequoia received less than a reasonably equivalent value and less than fair consideration in exchange for the 2010 Transfer. |
| 74 | The 2010 Transfer was made (a) at a time when the Debtor was engaged or was about to engage in a business and transactions for which the remaining assets of the Debtor were unreasonably small in relation to the business and transactions, (b) at a time when the Debtor intended to incur, or believed or should reasonably have believed that it would incur, debts beyond its ability to pay as they became | 42 | The 2010 Transfer was made (a) at a time when Sequoia was engaged or was about to engage in business activities and transactions for which the remaining assets of Sequoia were unreasonably small in relation to the business and transactions, (b) at a time when Sequoia intended to incur, or believed or should reasonably have believed that it would incur, debts beyond its ability to |

| | | | |
|---|---|---|---|
| | due, (c) at a time when the Debtor was insolvent or (d) with the result that the Debtor became insolvent as a result of the 2010 Transfer. | | pay as they became due, (c) at a time when Sequoia was insolvent and/or (d) with the result that Sequoia became insolvent as a result of the 2010 Transfer. |
| 75 | At all times relevant to this Complaint, there were actual creditors of the Debtor with allowable unsecured claims who could avoid the 2010 Transfer under | 43 | At the time of the 2010 Transfer, Sma1tmatic International and Smartmatic Services were creditors of Sequoia. |
| 76 | Dominion US did not give value to the Debtor in exchange for the 2010 Transfer and did not enter into the 2010 Transfer in good faith. | 44 | Dominion US did not give reasonably equivalent value or fair consideration to Sequoia in exchange for the 2010 Transfer and did not enter into the 2010 Transfer in good faith. |
| 77 | Accordingly, each of the Transfers should be avoided and set aside as fraudulent under 11 U.S.C. § 544(b)(1) and applicable law, including but not limited to C.R.S. §§ 38-8-105 and 106 and/or Delaware Code tit. 6, §§ 1304 and 1305. | 45 | Accordingly, the 2010 Transfer should be avoided and set aside as fraudulent under applicable law, including but not limited to N.Y. Debt. & Cred. Law §§ 273, 274 and 275: C.R.S. §§ 38-8-l05 and l06 and/or Delaware Code tit. 6, §§ 1304 and 1305, |
| | WHEREFORE, Plaintiff requests entry of a judgment in its favor against Dominion Canada and Dominion US as follows: . . . (b) For avoidance and recovery of the 2009 Transfer and the 2010 Transfer, or the value thereof . . . (e) For pre- and post-petition interest on the amounts owed Dominion Canada and Dominion US to the full extent allowed under applicable law at the highest legal rate; (f) For all costs under applicable law; and (g) For such other and further relief as is just and proper. | | WHEREFORE, Plaintiffs request entry of a judgment in their favor against Defendants as follows: (a) For avoidance and recovery of the 2009 Transfer and the 2010 Transfer, or the value thereof; (b) For interest on the amounts owed by Defendants to the full extent allowed under applicable law at the highest legal rate; (c) For all attorney's fees and costs under applicable law; and (d) For such other and further relief as is just and proper |