UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

| | |
|---|---|
| SMARTMATIC USA CORPORATION, SMARTMATIC INTERNATIONAL CORPORATION, and SMARTMATIC SERVICES CORPORATION | ) ) ) ) ) |
| Plaintiffs, | ) ) Civ. 13-05349 (KBF) |
| -v- | ) ) |
| DOMINION VOTING SYSTEMS CORPORATION and DOMINION VOTING SYSTEMS, INC., | ) ) ) |
| Defendants. | ) ) ) |

_____

**DOMINION'S MEMORANDUM OF LAW (1) IN OPPOSITION TO PLAINTIFFS'
MOTION TO REMAND AND FOR ABSTENTION AND (2) IN FURTHER SUPPORT
OF DOMINION'S MOTION TO TRANSFER VENUE**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ i

INTRODUCTION ............................................................................................................1

ARGUMENT ...................................................................................................................2

I.      THIS COURT HAS JURISDICTION OVER THIS ACTION .........................................2

        A.      The Claims in the New York Action "Arise In" the SVS Bankruptcy
                Case............................................................................................................2

        B.      The New York Action is "Related to" the SVS Bankruptcy Case .........................5

II.     THE COURT SHOULD NEITHER ABSTAIN FROM HEARING NOR
        EQUITABLY REMAND THE NEW YORK ACTION ....................................................8

III.    ALTERNATIVELY, THE COURT COULD STAY THE NEW YORK
        ACTION PENDING FURTHER DEVELOPMENTS IN THE COLORADO
        ACTION ..................................................................................................................10

# TABLE OF AUTHORITIES

<u>Cases</u>

*Allstate Ins. Co. v. Credit Suisse Sec. (USA) LLC*,
    No. 11 Civ. 2232(NRB), 2011 WL 4965150 (S.D.N.Y. Oct. 19, 2011) ...................... 6, 7

*Alpert's Newspaper Delivery, Inc. v. N.Y. Times Co.*,
    876 F.2d 266 (2d Cir. 1989)................................................................................. 5

*Bayerische Landesbank v. Deutsche Bank AG (In re Residential Capital, LLC)*,
    488 B.R. 565 (Bankr. S.D.N.Y. 2013) ................................................................. 5

*Best Mfg., Inc. v. White Plains Coat & Apron Co. (In re Daniele Laundries, Inc.)*,
    40 B.R. 404 (Bankr. S.D.N.Y. 1984) ................................................................... 3

*Fried v. Lehman Bros. Real Estate Assoc. III, L.P.*, No. 11 Civ. 04141 (LGS),
    2013 WL 2359493 (S.D.N.Y. May 30, 2013) ...................................................... 8

*General Elec. Capital Corp. v. Pro-Fac Coop., Inc.*, No. 01 CIV 10215 LTS JCF,
    2002 WL 1300054 (S.D.N.Y. June 11, 2002) ..................................................... 8

*Greenfield v. Nat'l Westminster Bank USA*,
    846 F. Supp. 302 (S.D.N.Y. 1994) ..................................................................... 1

*In re Indu Craft Inc.*, Nos. 11 Civ. 5996(JMF), 11 Civ. 6303(JMF), 11 Civ. 6304(JMF),
    2012 WL 3070387 (S.D.N.Y. July 27, 2012) ..................................................... 5

*Kaiser Grp. Holdings, Inc. v. Squire Sanders & Dempsey LLP (In re Kaiser Grp. Int'l., Inc.)*,
    421 B.R. 1 (Bankr. D.D.C. 2009) ....................................................................... 8

*New York City Emp. Ret. Sys. V. Ebbers* (*In re WorldCom, Inc. Sec. Litig.*),
    293 B.R. 308 (S.D.N.Y. 2003).............................................................................. 6

*Official Comm. of Asbestos Claimants of G-I Holdings, Inc. v. Heyman*,
    306 B.R. 746 (S.D.N.Y. 2004).............................................................................. 3

*Parmalat Capital Fin. Ltd. v. Bank of Am. Corp.*,
    639 F.3d 572 (2d Cir. 2011).................................................................................. 9

*Publicker Indus. Inc. v. United States* (*In re Cuyahoga Equip. Corp.*),
    980 F.2d 110 (2d Cir. 1992).................................................................................. 5

*Sealink Funding Ltd. v. Bear Stearns & Co.*,
    12 CIV. 1397 LTS HBP, 2012 WL 4794450 (S.D.N.Y. Oct. 9, 2012) ............................ 7

*Winstar Holdings, LLC v. Blackstone Group L.P.*,
    No. 07 Civ. 4634 (GEL), 2007 WL 4323003 (S.D.N.Y. Dec. 10, 2007) ................ 7, 9, 10

*Wood v. Wood (In re Wood)*,
   825 F.2d 90 (5th Cir. 1987) ............................................................................ 6

<u>Statutes</u>

28 U.S.C. § 157(b)(2)(H) ...................................................................................... 3

ii

## INTRODUCTION

Dominion[1] respectfully submits this memorandum of law (1) in opposition to Smartmatic's motion to remand this case (the "New York Action") to New York state court and for abstention and (2) in further support of Dominion's motion to transfer venue of the New York Action to the Colorado Federal Courts – the venue of the SVS bankruptcy case.[2]

The remand and abstention issues before this Court revolve around a central question:  Is Smartmatic's recently-filed fraudulent transfer suit against Dominion in New York inherently at odds with the SVS Trustee's earlier-filed fraudulent transfer suit against Dominion in Colorado (the "Colorado Action"), in a manner sufficient to establish federal court jurisdiction over the New York Action?  The answer is yes.  Despite Smartmatic's attempts to characterize the conflict between the two actions as only "hypothetical," the claims in the New York Action are subsumed within, and conflict with, the primary claims in the Colorado Action.[3]  On that basis, federal jurisdiction exists.

Smartmatic, as the plaintiff in the New York Action and as the sole funding source for the Colorado Action, is the force behind both suits, as detailed in the Declaration of George W. Shuster, Jr., dated September 9 ("Shuster Decl.") Ex. A.  Smartmatic would have Dominion defend both actions simultaneously, one in the Colorado Federal Courts and the other in New York state court, ensuring duplicative litigation and risking inconsistent results, at least until a final judgment is reached in Colorado.  Dominion seeks only to have the identical claims brought

---

[1]   Capitalized terms used but not defined herein shall have the meanings ascribed to them in Dominion's Notice of Removal and Motion to Transfer Venue, as applicable.

[2]   Pursuant to the Court's order dated August 14, 2013, Dominion has consolidated its opposition to Smartmatic's motion to remand with Dominion's reply in further support of its motion to transfer venue.

[3]   Smartmatic downplays the facts giving rise to jurisdiction in the New York Complaint and in its motion to remand, but in the analogous context of evaluating federal question jurisdiction, "courts will not permit plaintiff to use artful pleading to close off defendant's right to a federal forum," particularly where a plaintiff chooses a state forum in order to evade the consequences of prior federal litigation or to get a second chance at the same litigation.  *Greenfield v. Nat'l Westminster Bank USA*, 846 F. Supp. 302, 305 (S.D.N.Y. 1994).

1

against it adjudicated in one place, the Colorado Federal Courts—the forum where Smartmatic, first on its own, and then acting through the SVS Trustee, chose to sue Dominion for the alleged fraudulent transfers of Sequoia assets that are the sole basis for both the Colorado Action and the New York Action.

As to venue, Smartmatic has only addressed the order in which the Court should consider the parties' motions for remand and venue transfer, not whether a change of venue is appropriate if remand is denied.[4]   Dominion does not object to deferring adjudication of its motion to transfer venue until after the Court determines its jurisdiction over the New York Action.  Accordingly, the current dispute focuses on jurisdiction, not venue.

## ARGUMENT

## I.   THIS COURT HAS JURISDICTION OVER THIS ACTION

### A.   The Claims in the New York Action "Arise In" the SVS Bankruptcy Case

Removal of the New York Action was proper, and remand should be denied, because the Court has jurisdiction under 11 U.S.C. § 1334(b).  The claims in the New York action "arise in" the SVS bankruptcy case in Colorado because they are inherently subsumed within the SVS Trustee's identical fraudulent transfer claims in that case.  In arguing against "arising in" jurisdiction, Smartmatic asserts that any nexus to the federal bankruptcy claims asserted in the Colorado Action is only "hypothetical."  But the connection between the Colorado Action and the New York Action is based on the facts currently in the public record, and is not speculative. In the Colorado Action, the SVS Trustee earlier asserted state law fraudulent transfer claims under Section 544(b) of the Bankruptcy Code that are identical to those that Smartmatic now

---

[4] *See* Pls.' Mem. Law Opp'n Defs.' Mot. Transfer Venue at 2.

asserts in the New York Action.[5]  The SVS Trustee's claims are unquestionably subject to federal court "arising in" jurisdiction under 11 U.S.C. § 1334(b).[6]  Moreover, the SVS Trustee is the sole bankruptcy representative entitled to bring those claims.[7]  Because the SVS Trustee's "core" fraudulent transfer claims are identical to Smartmatic's claims, and because the SVS Trustee alone is entitled to bring those claims on behalf of alleged creditors like Smartmatic, Smartmatic's claims are subsumed within the SVS Trustee's claims.  Accordingly, Smartmatic's claims must, like the SVS Trustee's claims, "arise in" the SVS bankruptcy.

Smartmatic tries to argue that its claims will only be subsumed within the SVS Trustee's claims, and that this Court's jurisdiction will only exist, if the SVS Trustee prevails after final adjudication of the Colorado Action.[8]  But this is too narrow a view.  Dominion is aware of no court that has held that, when a trustee asserts an avoidance claim under Section 544(b) of the Bankruptcy Code, the claim must be fully adjudicated before individual creditors are precluded from bringing fraudulent transfer claims in other venues.  The mere assertion of the claim by a trustee is sufficient to subsume individual creditor claims while the trustee's action is pending.[9]  So, while the SVS Trustee, funded by Smartmatic, is pursuing its Section 544(b) fraudulent transfer claims, Smartmatic should not be permitted to pursue identical, and conflicting, claims

---

[5]    *See* Annex 1 (table comparing allegations in the Colorado Complaint to those in the New York Complaint).

[6]    In other words, they are core claims. *See* 28 U.S.C. § 157(b)(2)(H); *Official Comm. of Asbestos Claimants of G-I Holdings, Inc. v. Heyman*, 306 B.R. 746, 749 (S.D.N.Y. 2004) (Section 544(b) claims are core proceedings).

[7]    *See* Shuster Decl. Ex. A ¶¶ 16-18.

[8]    Smartmatic argues that because Dominion opposes the SVS Trustee's request for substantive consolidation in the Colorado Action,  consolidation is speculative.  But the SVS Trustee, with Smartmatic's support, continues to vigorously pursue its consolidation-based claims in the Colorado Action, and as described below, the mere assertion of those claims in the Colorado Action is sufficient to establish federal court jurisdiction over the New York Action.

[9]    *See Best Mfg., Inc. v. White Plains Coat & Apron Co. (In re Daniele Laundries, Inc.)*, 40 B.R. 404, 408 (Bankr. S.D.N.Y. 1984) (holding that because a trustee's Section 544(b) action is pending, an individual creditor's state court fraudulent transfer action is superseded and the creditor lacks standing to pursue its case).

in other venues simply because the SVS Trustee's claims have not yet been adjudicated. [10]

As a further attempt to create false distance between the Colorado Action and the New York Action, Smartmatic tries to obscure its direction of the SVS Trustee and his assertion of claims in the Colorado Action. Smartmatic disingenuously portrays itself as an independent third party creditor of Sequoia that is relying solely upon its claims in the New York Action for any prospect of recovery. In reality, the SVS Trustee is maintaining the Colorado Action almost exclusively for Smartmatic's benefit. Smartmatic, as SVS's largest creditor, is the party that stands to benefit the most from any recovery in the Colorado Action.[11]

Smartmatic chose to pursue its claims against Dominion in Colorado through the SVS bankruptcy case and should be bound by that choice. Smartmatic initially sought standing to bring the claims in the Colorado Action in its own name.[12] Although the Colorado Bankruptcy Court rejected Smartmatic's request, that court, also at Smartmatic's request, appointed the SVS Trustee to bring those claims for the benefit of all creditors, including, principally, Smartmatic.[13] *Smartmatic then agreed to fund all of the SVS Trustee's expenses to pursue the same fraudulent transfer claims against Dominion that Smartmatic filed in the New York Action*.[14] The SVS Trustee's complaint contains claims and allegations nearly identical to those that Smartmatic had proposed to bring in its own name.[15] The Colorado lawyers representing the SVS Trustee in the Colorado Action earlier represented Smartmatic in its failed attempt to obtain derivative standing

---

[10]   Smartmatic's position, if accepted, could create a scenario where, through a "rush to judgment" in this Court, Smartmatic could attempt to obtain a judgment against Dominion that would not only be inconsistent with a later judgment in the Colorado Action, but could be jurisdictionally invalid for lack of standing by Smartmatic if the SVS Trustee's substantive consolidation argument were accepted in the Colorado Action.

[11]   *See* Shuster Decl. Ex. B.

[12]   *See* Shuster Decl. Ex. C.

[13]   *See* Shuster Decl. Ex. D, E, F.

[14]   *See* Shuster Decl. Ex. G.

[15]   *See* Shuster Decl. Ex. H (Colorado Complaint), C at 21 (Smartmatic complaint attached as Ex. A).

to bring a complaint directly against Dominion.  In addition, the New York counsel who co-drafted the previously proposed Smartmatic complaint on which the SVS Trustee's Colorado Complaint is based represents Smartmatic in this action, and has filed the same form of complaint here.[16]  Thus, the identity of interest between SVS Trustee and Smartmatic is so substantial that, for the purposes of the fraudulent transfer claims against Dominion, the SVS Trustee and Smartmatic are essentially one and the same.[17]

Smartmatic's attempts to separate itself from the actions of the SVS Trustee in the Colorado Action as a way to avoid the jurisdictional consequences of his claims should not be countenanced.  Nor should the declaration of the SVS Trustee proffered by Smartmatic, in which the SVS Trustee attempts to shrug off the conflict between the two actions, be given credit.  The SVS Trustee and Smartmatic are effectively the same, and the SVS Trustee cannot waive federal court jurisdiction in a case in which he is not a party by purporting to consent to a remand.

### B.    The New York Action is "Related to" the SVS Bankruptcy Case

The Court also has "related to" jurisdiction over the New York Action because the outcome has the potential to affect the SVS bankruptcy estate and the amount available for distribution to creditors.  A court has "related to" bankruptcy jurisdiction over cases where the outcome "might have any 'conceivable effect' on [a bankruptcy] estate."[18]  "Certainty, or even likelihood, is not required" to satisfy the conceivable effect test.[19]  Instead, an action has a

---

[16]  *See* Shuster Decl. Ex. C at 21.

[17]  *See, e.g., Alpert's Newspaper Delivery, Inc. v. N.Y. Times Co.,* 876 F.2d 266, 270 (2d Cir. 1989) (finding that res judicata applied to bind a non-party to the litigation, because that party was "the admitted mastermind and financier of the [earlier] litigation and it is providing similar tactical and financial help in the instant case"); *In re Indu Craft Inc.,* Nos. 11 Civ. 5996(JMF), 11 Civ. 6303(JMF), 11 Civ. 6304(JMF), 2012 WL 3070387, at *12 n. 9 (S.D.N.Y. July 27, 2012) (applying res judicata to financier of litigation).

[18]  *Publicker Indus. Inc. v. United States* (*In re Cuyahoga Equip. Corp.*), 980 F.2d 110, 114 (2d Cir. 1992) (internal citations omitted).

[19]  *See Bayerische Landesbank v. Deutsche Bank AG (In re Residential Capital, LLC)*, 488 B.R. 565, 573 (Bankr. S.D.N.Y. 2013) (internal citations omitted).

conceivable effect if "the outcome could alter the debtor's rights, liabilities, options, freedom of action (either positively or negatively) and which in any way impacts upon the handling of the administration of the bankruptcy estate."[20]

The New York Action has the potential to affect the SVS bankruptcy estate regardless whether substantive consolidation occurs in the Colorado Action.  First, under the SVS Trustee's substantive consolidation theory, Smartmatic's claims in the New York Action belong exclusively to the SVS Trustee, and any effort by Smartmatic to pursue those claims would violate the automatic stay and necessarily affect the administration of the SVS bankruptcy estate.[21]  Second, even without substantive consolidation, the possibility that Smartmatic and the SVS Trustee could maintain identical claims to avoid the same transfers poses a conceivable effect on the SVS estate because Smartmatic and the SVS Trustee would be in direct competition for a limited pool of assets.[22]  Smartmatic's claim that the amount Dominion allegedly underpaid for the Purchased Assets could be in the tens of millions of dollars is fanciful, but that allegation, even if true, would not divest the Court of jurisdiction.  The mere possibility that a recovery by Smartmatic could reduce a recovery by the SVS Trustee and affect the amount available for distribution to creditors is sufficient to satisfy the broadly-applied "conceivable effects" test.[23]

Contrary to Smartmatic's suggestion at p. 20 of its motion, a finding of "related to" jurisdiction in this case would not permit every defendant in a claim by a bankruptcy trustee who

---

[20]   *New York City Emp. Ret. Sys. V. Ebbers* (*In re WorldCom, Inc. Sec. Litig.*), 293 B.R. 308, 317 (S.D.N.Y. 2003) (quoting *Celotex Corp. v. Edwards*, 514 U.S. 300, 308 n.6 (1995)).

[21]   *See* Shuster Decl. Ex. A ¶ 24.

[22]   *See* Shuster Decl. Ex. A ¶¶ 25-27.

[23]   *See Allstate Ins. Co. v. Credit Suisse Sec. (USA) LLC*, No. 11 Civ. 2232(NRB), 2011 WL 4965150, at *3 (S.D.N.Y. Oct. 19, 2011) ("'Conceivable effects' typically manifest themselves by altering '[t]he amount of property available for distribution to the creditors of a bankruptcy estate or the allocation of property among such creditors.'"); s*ee also Wood v. Wood (In re Wood)*, 825 F.2d 90, 94 (5th Cir. 1987) (even where suit "may ultimately have no effect on the bankruptcy," jurisdiction is established where a court "cannot conclude, on the facts before [it], that it will have no conceivable effect").

is also defending against a claim by another creditor to remove the creditor's claim to federal court because of a "common creditor" or "limited pool" argument. This case presents a much narrower, and possibly unique situation. Federal jurisdiction exists because Smartmatic first chose the forum of the Colorado Bankruptcy Court to bring claims against Dominion, designed the SVS Trustee's claims for Smartmatic's primary benefit, sought to substantively consolidate SVS and Sequoia, and then cloned the SVS Trustee's claims against Dominion in the New York Action in such a way that if consolidation is accepted the New York claims would be invalid. Under these narrow circumstances, Smartmatic's first choice of the Colorado Bankruptcy Court should prevail and federal jurisdiction exists over Smartmatic's claims, which are inextricably in conflict with the SVS Trustee's. Remand therefore should be denied.

The cases cited by Smartmatic do not alter the conclusion that the New York Action is "related to" the SVS bankruptcy case under 11 U.S.C. § 1334(b). In both the *Allstate* and *Sealink* decisions,[24] the courts held that indemnity claims that might arise against the debtor based on suits between two non-debtors were insufficient to establish "related to" jurisdiction.[25] But in each case, the potential indemnity claims were time-barred and therefore could have no conceivable effect on the debtor's estate.[26] In addition, *Allstate* and *Sealink* are not the only relevant authority. In the *Winstar* decision, Judge Lynch held that an action that could create indemnification claims against a debtor made that action "related to" the debtor's bankruptcy.[27]

---

[24] *Allstate*, 2011 WL 4965150; *Sealink Funding Ltd. v. Bear Stearns & Co.*, 12 CIV. 1397 LTS HBP, 2012 WL 4794450 (S.D.N.Y. Oct. 9, 2012).

[25] *See Allstate*, 2011 WL 4965150, at *4; *Sealink*, 2012 WL 4794450, at *3.

[26] *See id.*

[27] *Winstar Holdings, LLC v. Blackstone Group L.P.*, No. 07 Civ. 4634 (GEL), 2007 WL 4323003, at *1 n. 1 (S.D.N.Y. Dec. 10, 2007).

Likewise, the *General Electric* decision, supports this Court's "related to" jurisdiction over the New York Action.[28]  The *General Electric* court recognized that "a proceeding between non-debtors has a 'conceivable effect' on the bankruptcy estate where the dispute would 'affect how much property is available for distribution to the creditors of a bankruptcy estate . . . .'"[29]  In *General Electric*, the litigation merely would have clarified the amount of potentially valid claims against the estate—it would not have depleted a limited resource for estate recovery.  By contrast, the claims in the Colorado Action and the claims in the New York Action are limited to a single recovery, and amounts paid to satisfy a judgment in the New York Action could reduce, dollar-for-dollar, the amount available for distribution to SVS creditors.

## II.     THE COURT SHOULD NEITHER ABSTAIN FROM HEARING NOR EQUITABLY REMAND THE NEW YORK ACTION

Although a motion to remand addresses the Court's jurisdiction, and thus must be heard before a motion to transfer venue, an abstention motion relates to whether the court will exercise the jurisdiction it has.[30]  Here, the Colorado Federal Courts, which are familiar with the SVS Trustee's claims in the Colorado Action and Smartmatic's actions in the SVS bankruptcy case, should be given the first opportunity to determine abstention if venue is transferred to Colorado. Accordingly, Dominion submits that any abstention issues should be held in abeyance until after remand and venue are adjudicated.

---

[28]  *General Elec. Capital Corp. v. Pro-Fac Coop., Inc.*, No. 01 CIV 10215 LTS JCF, 2002 WL 1300054 (S.D.N.Y. June 11, 2002).

[29]  *Id.* at *2.

[30]  *See Fried v. Lehman Bros. Real Estate Assoc. III, L.P.*, No. 11 Civ. 04141 (LGS), 2013 WL 2359493, at *4 (S.D.N.Y. May 30, 2013); *see also Kaiser Group Holdings, Inc. v. Squire Sanders & Dempsey LLP (In re Kaiser Group Int'l., Inc.)*, 421 B.R. 1, 15 (Bankr. D.D.C. 2009).

Because Smartmatic's claims "arise in" the SVS bankruptcy case, the "mandatory abstention provision by its own terms do[es] not apply. . . ."[31]   But even if the Court were to determine that it has only "related to" jurisdiction over the New York Action, mandatory abstention under 28 U.S.C. § 1334(c) is not warranted here because, contrary to Smartmatic, the New York Action could *not* be "timely adjudicated" in New York state court.[32]   Although the New York state court could timely adjudicate the New York Action if it were a standalone state law fraudulent transfer action, the New York Action is duplicative and derivative of the Colorado Action.   Because the interplay of the two actions is complex, especially given the interaction of federal bankruptcy law issues and state law claims, the Colorado Federal Courts are the appropriate forum for their resolution.[33]   A New York state court should be extremely wary of proceeding in a case where Smartmatic may be found to lack standing and any judgment become a nullity, due to the SVS Trustee's pending substantive consolidation claims.   In addition, a series of conflicts inevitably would arise relating to discovery, process, and the merits if both actions were permitted to proceed simultaneously.   These complexities would preclude timely adjudication of the New York Action in state court.

The Court should not permissively abstain under 28 U.S.C. § 1334(c)(1) nor equitably remand the New York Action under 28 U.S.C. § 1452(b) because the applicable criteria favor adjudication of the New York Action in the federal courts.   Here, given the interplay of the federal bankruptcy law issues in the Colorado Action with the otherwise straightforward state law claims in the New York Action, no basis exists to invoke comity of the state courts.[34] Instead, as described above, the New York Action is substantially related to, and would impede

---

[31]   *See Winstar*, 2007 WL 4323003, at *1.

[32]   *See Parmalat Capital Fin. Ltd. v. Bank of Am. Corp.*, 639 F.3d 572 (2d Cir. 2011).

[33]   *See Parmalat*, 639 F.3d at 580 (complexity is a factor in evaluating "timely adjudication").

[34]   *See Winstar*, 2007 WL 4323003, at *5.

the administration of, the SVS bankruptcy case.[35]  For these reasons, the Court should exercise its jurisdiction over the New York Action, and ultimately the New York Action should be resolved in the Colorado Federal Courts where Smartmatic first chose to sue Dominion.

## III.   ALTERNATIVELY, THE COURT COULD STAY THE NEW YORK ACTION PENDING FURTHER DEVELOPMENTS IN THE COLORADO ACTION

Although the motion to remand should be denied and this action should be transferred to the Colorado Federal Courts so that it can be resolved in conjunction with the identical claims in the Colorado Action, Dominion recognizes that this Court could partially stay the New York Action as an alternative to deciding the jurisdictional and venue issues at this time.  Dominion's pending motion to dismiss the Colorado Action is set for hearing on September 26.

During the pendency of that motion to dismiss, the Colorado Bankruptcy Court has not authorized discovery.  If discovery is authorized in Colorado and if this Court stays the New York Action,  it would make sense for this Court nevertheless to permit discovery on a consolidated basis with discovery in the Colorado Action.  Because discovery likely would be identical in both actions, consolidated discovery would promote efficiency and should not impose any additional burden.  A stay of all issues in the New York Action other than discovery, until the completion of consolidated discovery in both actions, would prevent the inherent unfairness of requiring Dominion to simultaneously defend two identical actions maintained by effectively the same plaintiff in separate forums, while also avoiding prejudice to the parties.[36]

---

[35]   *See id. at *6.*

[36]   Smartmatic states that it has filed the New York Action only to avoid the expiration of applicable statutes of limitations. *See* Pls.' Mem. Law Opp'n Defs.' Mot. Transfer Venue at 22 n.10.  Smartmatic also represents that it would be willing to dismiss the New York Action if the SVS Trustee's fraudulent transfer claims in the Colorado Action are permitted to proceed based on its substantive consolidation theory.  *See id.* Thus, a stay would not prejudice Smartmatic.

Dated:  September 9, 2013

WILMER CUTLER PICKERING
 HALE AND DORR LLP


By: /s/ George W. Shuster, Jr.
George W. Shuster, Jr.
Jeremy S. Winer
7 World Trade Center
250 Greenwich Street
New York, New York 10007
Tel:  (212) 230-8800

Richard A. Johnston
60 State Street
Boston, MA 02109
Tel:  (617) 526-6282

*Counsel for Defendants Dominion Voting
Systems Corporation and Dominion Voting
Systems, Inc.*

11

**ANNEX 1**
Comparison of Colorado Complaint and New York Complaint

| Colorado Complaint | | New York Complaint | |
|---|---|---|---|
| Paragraph | Allegation | Paragraph | Allegation |
| 20 | In 2009, Sequoia began experiencing cash flow challenges, including difficulties in meeting payroll. This led Sequoia management to investigate potential purchasers or investors in Sequoia. | 15 | In 2009, Sequoia began experiencing cash flow challenges, including difficulties in meeting payroll. This led Sequoia management to investigate potential purchasers or investors in Sequoia. |
| 21 | Sequoia and the State of New York Executive Department, Office of General Services are parties to Comptroller's Contract No. PC63813 for Voting Systems and Related Services and Ballot Marking or Other Voting Devices Accessible to Individuals with Disabilities (as amended from time to time, the "NY Contract"). Pursuant to the NY Contract, for the period from January 23, 2008 through January 31, 2013, counties in New York could purchase electronic voting machines and other related goods and services from Sequoia through a requisition process under the terms and conditions set forth in the NY Contract. | 16 | Sequoia and the State of New York Executive Department, Office of General Services were parties to Comptroller's Contract No. PC63813 for Voting Systems and Related Services and Ballot Marking or Other Voting Devices Accessible to Individuals with Disabilities (as amended from time to time, the "NY Contract").  Pursuant to the NY Contract, for the period from January 23, 2008 through January 31, 2013, counties in New York could purchase electronic voting machines and other related goods and services from Sequoia through a requisition process under the terms and conditions set forth in the NY Contract. |
| 22 | In April 2009, Sequoia approached Dominion Canada about a possible transaction involving the NY Contract. Sequoia and Dominion Canada entered into an Asset Purchase Agreement, dated July 15, 2009 (the "2009 APA"), pursuant to which Dominion Canada acquired the NY Contract and Sequoia's rights under a related lease. In exchange, Dominion Canada agreed to pay Sequoia | 17 | In April 2009, Sequoia approached Dominion Canada about a possible transaction involving the NY Contract. Sequoia and Dominion Canada entered into an Asset Purchase Agreement, dated July 15,2009 (the "2009 APA"), pursuant to which Dominion Canada acquired the NY Contract and Sequoia's rights under a related lease. In exchange, Dominion Canada agreed to pay Sequoia |

| | | | |
|---|---|---|---|
| | an aggregate of $2.366 million in cash and a percentage of any Qualified NYS Order or NYC Order (each as defined in the 2009 APA) in 2009 or 2010. | | an aggregate of $2.366 million in cash and a percentage of any Qualified NYS Order or NYC Order (each as defined in the 2009 APA) in 2009 or 2010 (the "2009 Transfer"). |
| 23 | On information and belief, based on discovery under Fed. R. Bankr. P. 2004, Dominion Canada paid Sequoia the $2.366 million in cash consideration under the 2009 APA, but there were no Qualified NYS Order or NYC Order so no additional consideration was paid to Sequoia. | 20 | On information and belief, Dominion Canada paid Sequoia the $2.366 million in cash consideration under the 2009 APA, but there were no Qualified NYS Orders or NYC Orders so no additional consideration was paid to Sequoia. |
| 24 | On information and belief, based on discovery under Fed. R. Bankr. P. 2004, the NY Contract and the individual contracts with New York counties entered into under this master agreement constituted some of Sequoia's most valuable and most profitable assets. | 21 | On information and belief, the NY Contract and the individual contracts with New York counties entered into under the NY Contract constituted some of Sequoia's most valuable and most profitable assets. |
| 25 | Sequoia neither marketed the NY Contract to any party other than Dominion Canada nor shopped the offer from Dominion Canada to any other party. On information and belief, based on discovery under Fed. R. Bankr. P. 2004, the assets sold under the 2009 APA were worth more than the consideration paid by Dominion Canada. | 22 | Sequoia neither marketed the NY Contract to any party other than Dominion Canada nor shopped the offer from Dominion Canada to any other party. On information and belief, the assets sold under the 2009 APA were worth more than the consideration paid by Dominion Canada. |
| 26 | The 2009 APA did not resolve Sequoia's cash flow difficulties, and within months after the closing of the 2009 APA, Sequoia began investigating the possibility of locating a potential purchaser. | 24 | The 2009 APA did not resolve Sequoia's cash flow difficulties, and within months after the closing of the 2009 APA, Sequoia began investigating the possibility of locating a potential purchaser. |
| 27 | In January 2010, Sequoia and Dominion opened discussions on | 25 | In January 2010, Sequoia and Dominion opened discussions on |

|  | a larger transaction between the two, and in February 2010, Sequoia and Dominion exchanged term sheets describing a potential transaction. |  | a larger transaction between the two, and in February 2010, Sequoia and Dominion exchanged term sheets describing a potential transaction. |
|---|---|---|---|
| 28 | In term sheets circulated on or about February 11, 16, and 18, 2010, the parties discussed a purchase by Dominion of 90-98% of the equity interests in Sequoia (presumably from the Debtor) for a price to be determined. In connection with this deal, Dominion would enter into a one-year employment contract with Jack Blaine, Sequoia's chief executive officer, at an annual salary of $120,000 plus $30,000 in other benefits. | 26 | In term sheets circulated on or about February 11, 16, and 18, 2010, the parties discussed a purchase by Dominion of 90-98% of the equity interests in Sequoia for a price to be determined. In connection with this deal, Dominion would enter into a one-year employment contract with Jack Blaine, Sequoia's chief executive officer, at an annual salary of $120,000 plus $30,000 in other benefits. |
| 29 | In a March 5, 2010 letter of intent, Dominion US proposed to purchase substantially all of the assets of Sequoia (excluding accounts receivable, cash balances, and tax assets) for an aggregate purchase price of $9.5 million, consisting of $5 million in cash plus up to $4.5 million in contingent payments. | 27 | In a March 5, 2010 letter of intent, Dominion US proposed to purchase substantially all of the assets of Sequoia (excluding accounts receivable, cash balances, and tax assets) for an aggregate purchase price of $9.5 million, consisting of $5 million in cash plus up to $4.5 million in contingent payments. |
| 30 | On June 4, 2010, Sequoia and Dominion US entered into an Asset Purchase Agreement (the "2010 APA"). Under the 2010 APA, Dominion US purchased from Sequoia substantially all of the assets of Sequoia (again, excluding accounts receivable, cash balances, and tax assets) for an aggregate of $7.5 million, consisting of approximately $3 million in cash plus up to an aggregate of $4.5 million in contingent payments. | 28 | On June 4, 2010, Sequoia and Dominion US entered into an Asset Purchase Agreement (the "2010 APA"). Under the 2010 APA, Dominion US purchased from Sequoia substantially all of the assets of Sequoia (again, excluding accounts receivable, cash balances, and tax assets) for an aggregate of $7.5 million, consisting of approximately $3 million in cash plus up to an aggregate of $4.5 million in contingent payments (the "2010 Transfer"). |

| 31 | At approximately the same time, Dominion Canada and Blaine entered into an employment agreement on substantially better terms than provided in the March 5, 2010 letter of intent. The Employment Agreement was for three years and provided Blaine with an annual salary of $350,000, annual living expenses of more than $50,000, a percentage of Dominion's revenue from non-US business generated by Blaine, together with a one-year salary and benefits severance package if he were terminated before the end of the three year term of the agreement. | 29 | At approximately the same time, Dominion Canada and Blaine entered into an employment agreement on substantially better terms than provided in the March 5, 2010 letter of intent. The Employment Agreement was for three years and provided Blaine with an annual salary of $350,000, annual living expenses of more than $50,000, a percentage of Dominion's revenue from non-US business generated by Blaine, together with a one-year salary and benefits severance package if he were terminated before the end of the three year term of the agreement. |
|---|---|---|---|
| 32 | During the time of the negotiations with Dominion, Sequoia received an offer from a prominent company in the elections machine industry to purchase its assets.  Though Sequoia did not pursue this offer, the Plaintiff believes that if Sequoia had pursued such offer, the competition for Sequoia's assets would have provided a safeguard against a fire sale of Sequoia's assets and would have resulted in a higher purchase price, including a higher guaranteed cash component of the purchase price. On information and belief, some Sequoia management preferred this third-party offer to a sale of Sequoia's assets to Dominion. | 30 | During the time of the negotiations with Dominion. Sequoia received at least one offer from a prominent company in the elections industry to purchase Sequoia's assets and made an offer to another prominent company. Though Sequoia did not pursue these offers, Plaintiffs believe that if Sequoia had pursued such offers, the competition for Sequoia's assets would have provided a safeguard against a fire sale of Sequoia's assets and would have resulted in a higher purchase price, including a higher guaranteed cash component of the purchase price. On information and belief, some Sequoia management preferred one of these third-party offers to a sale of Sequoia's assets to Dominion. |
| 33 | Upon information and belief, based on discovery under Fed. R. Bankr. P. 2004, Sequoia has | 31 | Upon information and belief, Sequoia has received the cash consideration from Dominion |

4

| | | | |
|---|---|---|---|
| | received the cash consideration from Dominion US under the 2010 APA but none of the contingent payments. It is not expected that the contingent payments will be paid under the terms of the 2010 APA. | | US under the 2010 APA but none of the contingent payments. It is not expected that the contingent payments will be paid under the terms of the 2010 APA. |
| 34 | Setting aside the $4.5 million contingent payments proposed by Dominion (which Plaintiff understands were unlikely to ever be paid), Sequoia sold substantially all of its assets to Dominion US for $3 million, i.e., $2 million less than the amount originally proposed by Dominion US and, upon information and belief, substantially less than a competing offer received from a third party. In contrast, the employment agreement with Blaine, who was one of Sequoia's principal negotiators on the 2010 APA, improved substantially: salary from $120,000 to $350,000; annual benefits of $30,000 to more than $50,000; a one-year employment term to a three-year employment term; and the introduction of a one-year severance package. | 32 | Setting aside the $4.5 million contingent payments proposed by Dominion (which Plaintiffs understand were unlikely to ever be paid), Sequoia sold substantially all of its assets to Dominion US for $3 million, i.e., $2 million less than the amount originally proposed by Dominion US and, upon information and belief, substantially less than a competing offer received from a third party. In contrast, the employment agreement with Blaine, who was one of Sequoia's principal negotiators on the 2010 APA, improved substantially: salary from $120,000 to $350,000; annual benefits of $30,000 to more than $50.000; a one-year employment term to a three-year employment term; and the introduction of a one-year severance package. |
| 46 | The Debtor received less than a reasonably equivalent value in exchange for the 2009 Transfer. | 35 | Sequoia received less than a reasonably equivalent value and less than fair consideration in exchange for the 2009 Transfer. |
| 47 | The 2009 Transfer was made (a) at a time when the Debtor was engaged or was about to engage in a business and transactions for which the remaining assets of the Debtor were unreasonably small in relation to the business and transactions, (b) at a time when the Debtor intended to incur, or believed or should | 36 | The 2009 Transfer was made (a) at a time when Sequoia was engaged or was about to engage in business activities and transactions for which the remaining assets of Sequoia were unreasonably small in relation to the business and transactions, (b) at a time when Sequoia intended to incur, or |

5

|  | reasonably have believed that it would incur, debts beyond its ability to pay as they became due, (c) at a time when the Debtor was insolvent or (d) with the result that the Debtor became insolvent as a result of the 2009 Transfer. |  | believed or should reasonably have believed that it would incur, debts beyond its ability to pay as they became due, (c) at a time when Sequoia was insolvent and/or (d) with the result that Sequoia became insolvent as a result of the 2009 Transfer. |
|---|---|---|---|
| 48 | At all times relevant to this Complaint, there were actual creditors of the Debtor with allowable unsecured claims who could avoid the 2009 Transfer under applicable state law. | 37 | At the time of the 2009 Transfer, Smartmatic International and Smartmatic Services were creditors of Sequoia. |
| 49 | Dominion Canada did not give value to the Debtor in exchange for the 2009 Transfer and did not enter into the 2009 Transfer in good faith. | 38 | Dominion Canada did not give reasonably equivalent value or fair consideration to Sequoia in exchange for the 2009 Transfer and did not enter into the 2009 Transfer in good faith. |
| 50 | Accordingly, the 2009 Transfer should be avoided and set aside as fraudulent under 11 U.S.C. § 544(b)(1) and applicable law, including but not limited to C.R.S. §§ 38-8-105 and 106 and/or Delaware Code tit. 6, §§ 1304 and 1305. | 39 | Accordingly, the 2009 Transfer should be avoided and set aside as fraudulent under applicable law, including but not limited to N.Y. Debt. & Cred. Law §§ 273, 274 and 275: C.R.S. §§ 38-8-105 and 106; and/or Delaware Code tit. 6, §§ 1304 and 1305. |
| 73 | The Debtor received less than a reasonably equivalent value in exchange for the 2010 Transfer. | 41 | Sequoia received less than a reasonably equivalent value and less than fair consideration in exchange for the 2010 Transfer. |
| 74 | The 2010 Transfer was made (a) at a time when the Debtor was engaged or was about to engage in a business and transactions for which the remaining assets of the Debtor were unreasonably small in relation to the business and transactions, (b) at a time when the Debtor intended to incur, or believed or should reasonably have believed that it would incur, debts beyond its ability to pay as they became | 42 | The 2010 Transfer was made (a) at a time when Sequoia was engaged or was about to engage in business activities and transactions for which the remaining assets of Sequoia were unreasonably small in relation to the business and transactions, (b) at a time when Sequoia intended to incur, or believed or should reasonably have believed that it would incur, debts beyond its ability to |

| | | | |
|---|---|---|---|
| | due, (c) at a time when the Debtor was insolvent or (d) with the result that the Debtor became insolvent as a result of the 2010 Transfer. | | pay as they became due, (c) at a time when Sequoia was insolvent and/or (d) with the result that Sequoia became insolvent as a result of the 2010 Transfer. |
| 75 | At all times relevant to this Complaint, there were actual creditors of the Debtor with allowable unsecured claims who could avoid the 2010 Transfer under | 43 | At the time of the 2010 Transfer, Sma1tmatic International and Smartmatic Services were creditors of Sequoia. |
| 76 | Dominion US did not give value to the Debtor in exchange for the 2010 Transfer and did not enter into the 2010 Transfer in good faith. | 44 | Dominion US did not give reasonably equivalent value or fair consideration to Sequoia in exchange for the 2010 Transfer and did not enter into the 2010 Transfer in good faith. |
| 77 | Accordingly, each of the Transfers should be avoided and set aside as fraudulent under 11 U.S.C. § 544(b)(1) and applicable law, including but not limited to C.R.S. §§ 38-8-105 and 106 and/or Delaware Code tit. 6, §§ 1304 and 1305. | 45 | Accordingly, the 2010 Transfer should be avoided and set aside as fraudulent under applicable law, including but not limited to N.Y. Debt. & Cred. Law §§ 273, 274 and 275: C.R.S. §§ 38-8-l05 and l06 and/or Delaware Code tit. 6, §§ 1304 and 1305, |
| | WHEREFORE, Plaintiff requests entry of a judgment in its favor against Dominion Canada and Dominion US as follows:  . . . (b) For avoidance and recovery of the 2009 Transfer and the 2010 Transfer, or the value thereof . . . (e) For pre- and post-petition interest on the amounts owed Dominion Canada and Dominion US to the full extent allowed under applicable law at the highest legal rate; (f) For all costs under applicable law; and (g) For such other and further relief as is just and proper. | | WHEREFORE, Plaintiffs request entry of a judgment in their favor against Defendants as follows: (a) For avoidance and recovery of the 2009 Transfer and the 2010 Transfer, or the value thereof; (b) For interest on the amounts owed by Defendants to the full extent allowed under applicable law at the highest legal rate; (c) For all attorney's fees and costs under applicable law; and (d) For such other and further relief as is just and proper |